THE STATE OF OHIO, APPELLEE, *v.* MINK, APPELLANT.

[Cite as *State v. Mink,* 101 Ohio St.3d 350, 2004-Ohio-1580.]

(No. 2001–1429—Submitted January 13, 2004—Decided April 14, 2004.)

FRANCIS E. SWEENEY, SR., J.

{¶ 1} In this appeal, defendant-appellant, Scott A. Mink, appeals from his convictions and death sentence for the aggravated murders of his parents, William and Sheila Mink.

{¶ 2} The evidence at trial revealed that in September 2000, Scott A. Mink, then 36 years old, resided with his parents, 79–year–old William and 72–year–old Sheila Mink, in their second-floor duplex apartment in Union, Ohio. Mink used illegal drugs while living with his parents. As his drug use increased, his parents set curfew limits and restrictions on the use of his truck.

{¶ 3} In early to mid-September 2000, Mink's parents informed Mink that he would not be allowed to join them in their move to a smaller apartment. On September 18, William G. Mink, Mink's brother, asked Mink about his moving plans, and he replied, "kind of nasty like, * * * don't worry about it, I've got a plan."

{¶ 4} Around 9:00 p.m. on September 19, 2000, Mink and Bryan Werling were drinking and smoking crack cocaine at Werling's apartment in West Milton. Around 9:30 p.m., Mink's parents called Mink at Werling's apartment and told Mink to return home. Mink then departed and told Werling that "he had to get home or he wasn't going to have a place to stay."

{¶ 5} At approximately 10:00 p.m., Mink arrived home. After his parents went to bed, Mink looked for his truck keys so that he could leave the apartment and get more drugs. Mink was unable to find the keys, and after realizing that his parents had hidden them, he had a "fit of uncontrollable rage."

{¶ 6} According to his subsequent confession, Mink went into his parents' bedroom sometime after 11:20 p.m. They were sleeping on adjacent twin beds, and he repeatedly hit them with a ball-peen hammer. The hammer broke while he was striking them. Mink left his parents' bedroom and returned with two

kitchen knives and an extension cord. Mink then stabbed each of them several times. One knife broke during the attack, and Mink left the other knife in his mother's chest. Mink also strangled his mother with the extension cord. Finally, Mink repeatedly struck both parents with two cutting boards that he had taken from the kitchen. After one cutting board broke, Mink reassembled it and put it back on the kitchen counter.

{¶ 7} Following the attack, Mink washed up and put on fresh clothes. Mink then took $7 and a British Petroleum ("BP") credit card from his father's wallet and took his mother's Bank One card. After finding his truck keys, Mink left the apartment, went to a Bank One automatic teller machine ("ATM"), and withdrew $10 from his parents' account. Mink then purchased what he thought was crack for $20. Around 1:30 or 2:30 a.m. on September 20, Mink returned home and discovered that the crack was not real. Mink then took five or six of his mother's tranquilizers and went to sleep.

{¶ 8} Mink woke up in the late afternoon of September 20. Mink then moved his father's body off his bed and laid him on top of his mother's body, which was lying between the twin beds. He covered the bodies with blankets to keep them out of view. Later that evening, Mink traded his father's Ford Escort to a drug dealer for $50 to $100 worth of rock cocaine.

{¶ 9} Around 5:00 a.m. on September 21, Mink phoned James Ornduff to ask whether he knew anyone interested in buying a television. Mink said that his "parents [were] out of town and he was trying to get * * * some money up for groceries." Mink then drove to East Dayton, where he exchanged his parents' television for $30 worth of crack. Mink also used his father's BP credit card to purchase cigarettes, beer, and a gallon of milk.

{¶ 10} Later on the same morning, Mink called Ornduff again and requested his help in selling a recliner, a microwave, a couple of pictures, a clock, and a watch. Mink said that his parents were on vacation and that they wanted him to clean out the garage. Mink loaded the property in his truck and transported it to Ornduff. Mink returned home around noon.

{¶ 11} Mink's three sisters and his brother lived in the Dayton area and frequently visited and talked with their parents on the phone. The sisters became concerned about their parents after they were unable to contact them on September 20. Around noon on September 21, the sisters drove to their parents' apartment to check on their well-being.

{¶ 12} When the sisters pulled into the driveway, they saw Mink entering their parents' apartment. The sisters then pounded on the front door and shouted for Mink to come out. When Mink answered the door, he would not let his sisters inside the apartment and said that he did not know the whereabouts of their parents. The sisters left to notify the police. As they arrived at the police

department, which was a short distance behind their parents' apartment, the sisters saw Mink walking to his truck. The sisters confronted Mink in the parking lot and asked for the keys to the apartment. One of them asked, "Scott, did you hurt Mom and Dad? And he said no." Mink then gave them the keys and drove away.

{¶ 13} The sisters entered the front door of the apartment, which opened into their parents' darkened bedroom. They did not recognize that their parents' bodies were under blankets between the beds. However, the sisters knew that something was wrong because their father's glasses and billfold were on the dresser even though the car was gone. The sisters left the apartment and called the police.

{¶ 14} At 12:41 p.m. on September 21, Officer Darrin Goudy, a Union police officer, was dispatched to the Mink apartment to check on the welfare of the residents. After talking to the three sisters outside, Officer Goudy entered the apartment and found the bodies of William and Sheila lying between the beds. Police secured the crime scene, obtained a search warrant, and began collecting evidence.

{¶ 15} William's body was found lying on top of Sheila's body, and their clothing and the surrounding floor were covered in blood. A kitchen knife was sticking out of Sheila's chest, and a cord was wrapped around her neck. The head of a broken hammer, a knife blade, and a wooden cutting board were on the floor near the bodies. The hammer handle and the knife handle were under the blankets and sheets on a bed. Blood spatters were found on a roll of carpet padding underneath the bed, suggesting that the victims were also attacked while on the floor.

{¶ 16} Police found a bloody wood-cutting board on the kitchen counter that had been broken into three pieces and reassembled. An empty microwave stand in the kitchen and an open space near a loose TV cable in the living room suggested that property had been taken from the apartment. The police also found a pair of bloody sneakers and a bloody tee-shirt in Mink's separate bedroom.

{¶ 17} On September 22, police contacted Ornduff after phone records showed that Mink had talked with him a number of times after the murders. Police then seized the television, recliner, microwave, two pictures, and a wall clock that Mink had transferred to Ornduff. Additionally, police learned that Mink had used or attempted to use his father's BP card seven or eight times after the murders. The police also located and seized William Mink's Ford Escort, which Mink had exchanged for drugs. Subsequent laboratory testing confirmed the presence of blood on the driver's-side seat belt and the driver's-side door.

{¶ 18} After leaving his sisters at the apartment on September 21, Mink stayed on a farm near Tipp City. Around 8:00 p.m. on September 24, Mink turned himself in at the Tipp City Police Department. Mink stated that he had "done something awful and had woke up in a field somewhere west of Tipp City." Mink was then arrested and taken into police custody.

{¶ 19} Around 11:00 p.m. on September 24, Detective Rick Bergman and Detective Thomas Peed interviewed Mink about William's and Sheila's murders. Mink was advised of his *Miranda* rights, which he waived. Mink provided detailed oral and written accounts of the murders that reflect the facts already described. Mink also gave a videotaped interview admitting his guilt.

{¶ 20} Dr. Kent Harshbarger, Deputy Coroner for Montgomery County, performed autopsies on both victims. William was stabbed 13 times, suffered at least 13 blunt-force impacts to the head, and endured four blunt-force impacts on the rest of his body. Other injuries on William's hand, wrist, and lower leg were defensive injuries and showed that William had been alive and defended against the attacks. William died from "multiple trauma, which consisted of blunt force trauma and multiple stab wounds."

{¶ 21} Sheila suffered nine blunt-force impacts to the head, four stab wounds to her chest and back, and 33 superficial stab wounds. The knife protruding into her chest extended four to four-and-one-half inches into her right lung. Sheila's blunt-force injuries were consistent with blows caused by the cutting board and hammer found at the scene. Sheila also suffered fractured bones in her neck due to strangulation and "was alive when all those injuries were inflicted." Dr. Harshbarger concluded that Sheila died from "multiple traumatic injuries, which include blunt force injuries, stab wounds and strangulation."

{¶ 22} Mink was subsequently indicted on four counts of aggravated murder for the deaths of his parents. Count 3 charged Mink with the aggravated murder of William with prior calculation and design, and Count 4 charged Mink with the aggravated murder of William during commission of a robbery. Count 5 charged Mink with the aggravated murder of Sheila with prior calculation and design, and Count 6 charged Mink with the aggravated murder of Sheila during commission of a robbery. Additionally, Mink was charged with aggravated robbery of William in Count 1 and aggravated robbery of Sheila in Count 2.

{¶ 23} The four counts of aggravated murder each contained three identical death penalty specifications: murder to escape detection or apprehension, R.C. 2929.04(A)(3), murder while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7), and murder as a "course of conduct" involving killing two or more people, R.C. 2929.04(A)(5).

{¶ 24} At trial, Mink waived counsel and pled guilty. After reviewing court-ordered competency evaluations and questioning Mink about his decisions, the

court ruled that Mink was competent to stand trial, competent to waive counsel and represent himself, and competent to waive a jury trial. His counsel were ordered to remain as his legal advisors.

{¶ 25} Before the three-judge panel, Mink entered pleas of guilty, and the state presented evidence of his guilt. The panel found Mink guilty of Counts 1 through 6 and Specifications 2 and 3 of Counts 3 through 6. The panel found Mink not guilty of Specification 1 of Counts 3 through 6.

{¶ 26} During the penalty phase, Mink waived the presentation of mitigating evidence and requested the death penalty. After finding that Mink was competent to waive mitigation, the court sentenced Mink to death for the murders and to prison terms for the remaining offenses.

{¶ 27} Mink now appeals to this court as a matter of right.

{¶ 28} Mink raises 18 propositions of law for our consideration, which we have considered fully. In addition, we have considered the death penalty for appropriateness and proportionality, and we have independently weighed the aggravating circumstances against the mitigating evidence. For the reasons that follow, we affirm Mink's convictions and uphold the sentence of death imposed.

{¶ 29} *Competency evaluations.* In propositions of law I, II, III, and V, Mink challenges the sufficiency of his competency evaluations. However, Mink did not object to any aspect of his competency evaluations at trial and thus waived all but plain error. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 30} In proposition of law I, Mink claims that the two psychologists who examined him were not qualified to evaluate his competency because he was receiving 150 milligrams of Effexor, an antidepressant, at the time of his evaluation. Mink argues that only a psychiatrist licensed to prescribe medication was qualified to render an opinion on his competence.

{¶ 31} Near the beginning of trial, Mink informed the court that he wished to plead guilty, waive counsel, and request the death penalty. The trial court then appointed Dr. Thomas Martin and Dr. Kim Stookey, two clinical psychologists, to conduct separate competency evaluations to ensure that Mink's decision was "voluntarily, intelligently, and knowingly made." The trial court ordered these evaluations even though the defense counsel disclosed that an independent psychologist had examined Mink and had found that he was competent. The trial court offered the defense the opportunity to "nominate" a psychiatrist or psychologist to conduct the evaluation, but the defense declined.

{¶ 32} During May 2001, Dr. Martin and Dr. Stookey conducted their competency evaluations of Mink. Both Dr. Martin and Dr. Stookey completed written reports finding that Mink was competent. At a hearing, Mink stipulated to the

"qualifications of the psychologists and also their findings in the reports." The trial court found that "both the examiners are qualified to evaluate the defendant and draw the conclusions and opinions that they draw." Thereafter, the trial court found that Mink was competent.

{¶ 33} R.C. 2945.371(A) provides that a competency examination shall be conducted by an "examiner," defined by R.C. 2945.37(A)(2) as either a "psychiatrist or a licensed clinical psychologist." The appointment of Dr. Martin and Dr. Stookey, licensed clinical psychologists, to conduct Mink's competency evaluations met that criterion. Moreover, Mink's stipulation to each psychologist's qualifications and findings now forecloses Mink's argument that their findings were flawed.

{¶ 34} There was also no plain error. Dr. Martin and Dr. Stookey were fully qualified to determine whether Mink's prescription medication would have affected his competency. See, generally, Annotation, Qualification of Nonmedical Psychologist to Testify as to Mental Condition or Competency (1999), 72 A.L.R.5th 529. Moreover, review of the competency evaluations reveals that Dr. Martin and Dr. Stookey were aware that Mink was taking or had taken antidepressant medication and considered its effect before reaching the conclusion that Mink was competent.

{¶ 35} Dr. Martin's evaluation mentions that Mink was taking 150 mg of Effexor–XR each morning. Dr. Martin reported that while Mink was depressed, Mink indicated that "without the medication (i.e., Effexor–XR), [he'd] be moody and reclusive, but with it [he's] okay." Dr. Martin evaluated Mink's state of depression by administering the Beck Depression Inventory ("BDI"). Mink obtained a "raw score of 9 on the BDI, which failed to indicate the presence of a depressive disorder." Thus, Dr. Martin was aware that Mink was taking Effexor–XR, discussed the effects of the drug with Mink, and conducted further testing that showed that Mink was not suffering from a depressive disorder.

{¶ 36} Dr. Stookey's evaluation did not mention that Mink was taking Effexor–XR or other antidepressant medications at the time of the competency evaluation. However, Dr. Stookey reported that Mink was treated for depression in early 1999 and was prescribed antidepressant medications. She also mentioned that Mink started heavily to use alcohol and crack cocaine during the fall of 1999. Dr. Stookey concluded that Mink's history of depression was related to his "chemical dependency."

{¶ 37} After receiving Dr. Martin's and Dr. Stookey's competency evaluations, the trial court questioned Mink about taking prescription medications before accepting his request to waive counsel and represent himself at trial. The trial court asked Mink, "Are you under the influence of any drugs, alcohol, or any other medication that in any way would affect your ability to understand what

we're doing here today or what I'm saying to you and to which you are responding?" Mink replied that he was not. Similarly, prior to accepting Mink's guilty plea, the trial court asked Mink whether he was under the influence of any "medication that in any way would affect your ability to understand what we are doing here today?" Again, Mink testified that he was not. Thus, the trial court not only relied upon the written competency evaluations but received Mink's own assurances that his ability to understand the proceedings was not adversely affected by any prescription medication that he was taking.

{¶ 38} Moreover, Mink's taking of antidepressant medications would not have affected the trial court's findings on Mink's competency. R.C. 2945.37(F) provides that a "court shall not find a defendant incompetent to stand trial solely because the defendant is * * * receiving or has received psychotropic drugs or other medication." See, also, *United States v. Grimes* (C.A.7, 1999), 173 F.3d 634, 635–636 (evidentiary hearing on defendant's competence not required after defense counsel asserted no more than that defendant was seeing a psychiatrist and taking antidepressant medication, was "paranoid" about his lawyers, and had trouble concentrating); *Hunter v. Bowersox* (C.A.8, 1999), 172 F.3d 1016, 1022 (findings of competency upheld despite contention that the defendant suffered from clinical depression and cocaine withdrawal); *State v. Borchers* (1995), 101 Ohio App.3d 157, 160, 655 N.E.2d 225 (defendant cannot be found incompetent solely because he is receiving medication to treat depression). Indeed, a defendant may be emotionally disturbed or even mentally ill and yet competent to stand trial. *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016.

{¶ 39} Based on the foregoing, we reject proposition I.

{¶ 40} In proposition of law II, Mink contends that the trial court's findings that he was competent were flawed because the two psychologists failed to examine Mink's medical and mental health treatment records prior to concluding that he was competent.

{¶ 41} Dr. Martin requested, but did not receive, Mink's medical and mental health records prior to completing his competency evaluation. These records included Mink's visit to the Crisis Care Facility in 2000, his three-day hospitalization at Miami Valley Hospital in April or May 2000, and his 28–day residential drug and later outpatient treatment program at Dayton's Center for Alcoholism and Drug Addiction Services ("CADAS") facilities in 1999. Similarly, Dr. Stookey reported that Mink's psychiatric treatment records were requested but not received prior to her evaluation.

{¶ 42} After Dr. Martin and Dr. Stookey submitted their reports, Mink did not object that the examiners had failed to review his medical and psychiatric records. Rather, Mink stipulated to the "qualifications of the psychologists and

also their findings in the reports." Therefore, Mink's stipulation and failure to object forecloses his argument that his competency evaluation was flawed.

{¶ 43} Moreover, there was no plain error. R.C. 2945.371(G) requires the examiner to file a written report with the court that shall include (1) the examiner's findings; (2) the facts in reasonable detail on which the findings are based; and (3) the findings or recommendations applicable to the issue of the defendant's competency to stand trial. Dr. Martin and Dr. Stookey's competency evaluations met these criteria.

{¶ 44} Dr. Martin's and Dr. Stookey's competency evaluations were thorough and complete. Dr. Martin clinically interviewed Mink for five hours over a three-day period. Through these interviews, Mink provided Dr. Martin with detailed information about Mink's family background, his education and work record, and the history of his medical and psychological problems. Dr. Martin learned that Mink was treated for depression in January 1999, attended a 28–day drug treatment program during July and August 1999, was hospitalized for alcohol and drug treatment for three days in April or May 2000, and received psychiatric treatment after an overdose of Alka–Seltzer Nite–Time medication in July or August 2000. Further, Dr. Martin learned that just a few days before the murders, Mink's family brought him to the Good Samaritan Hospital's Crisis Care facility. Mink also disclosed that he "never followed through with any treatment recommendations" from the hospital or crisis care center. Thus, Dr. Martin had a wealth of information about Mink's medical and psychiatric history. Additionally, Dr. Martin reviewed police reports, witness statements, and lab reports from the murder investigation.

{¶ 45} Dr. Martin also conducted psychological testing of Mink before rendering his opinion on Mink's competency. Testing included the Wechsler Adult Intelligence Scale–3d Edition ("WAIS–III"), the BDI, and the Minnesota Multiphasic Personality Inventory–2 ("MMPI–2").

{¶ 46} Dr. Martin's behavioral observations and mental-status examination of Mink resulted in detailed findings. Dr. Martin's exam revealed that Mink "was oriented to person, place, and time, and manifested no lapses in his level of consciousness." Mink reported that he did not experience phobias, panic attacks, bouts of unmanageable anxiety, or tactile hallucinations. However, Mink disclosed a history of alcohol and marijuana abuse and mentioned that he had smoked crack "at least 3 times a week for 5 or 6 years" and had spent $150 to $250 a week to support his "crack habit."

{¶ 47} Dr. Stookey's competency evaluation was similarly complete. Dr. Stookey interviewed Mink for four hours over a two-day period. During these interviews, Dr. Stookey received a detailed history about Mink's family background, his education, and his employment. Dr. Stookey learned about Mink's

long history of alcohol and drug abuse. Mink explained that he had entered a substance abuse treatment program and had done "fine." In June 1999, Mink was treated for depression and continued on his medications and counseling. However, in the fall of 1999, Mink started "heavy use" of alcohol and crack cocaine. Additionally, Dr. Stookey reviewed police reports, witness statements, and Mink's videotaped statement to the police.

{¶ 48} Dr. Stookey administered the MMPI–2 and the Georgia Court Competency Test. Based on her testing, interviews, and behavioral observations of Mink, Dr. Stookey concluded that "there are no symptoms of disordered thinking, other forms of psychosis, or mental retardation which would interfere with his ability to participate in all decisions relevant to the charges * * *, his ability to understand the nature and objective of the proceedings against him and ability to assist in his defense."

{¶ 49} Admittedly, review of Mink's medical and mental health records would have resulted in an even more complete evaluation. However, Dr. Martin and Dr. Stookey both conducted thorough and complete examinations of Mink before concluding that Mink was competent. Moreover, Mink does not contend that the results of his competency evaluations would have been different if the psychologists had reviewed his medical and mental health records before reaching their conclusion. Thus, any error is purely speculative.

{¶ 50} Further, the record shows that Mink acted sensibly throughout the trial, answered the trial court's questions in a straightforward fashion, and exhibited no irrational behavior. Under these circumstances, the trial court did not abuse its discretion in finding Mink competent, since "reliable, credible evidence" supported such findings. See State v. Vrabel, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33. Moreover, deference on these issues should be given to those "who see and hear what goes on in the courtroom." State v. Cowans (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298. Therefore, we find that proposition II lacks merit.

{¶ 51} In proposition of law III, Mink argues that the trial court's findings of competency were flawed because his history of depression, his suicide attempts, and his hospitalization were not adequately addressed.

{¶ 52} Dr. Martin and Dr. Stookey provided the trial court with expert advice on Mink's depression before concluding that Mink was competent. Dr. Martin reported that Mink suffered from depression and was being treated with the antidepressant medication, Effexor–XR. Moreover, Dr. Martin informed the court that "BDI [testing] failed to indicate the presence of a disabling depressive disorder." Although Dr. Stookey reported that Mink suffered from depression, she concluded that his history of depression appeared to be related to "chemical

dependency." Nevertheless, despite Mink's history of depression, Dr. Martin and Dr. Stookey concluded that Mink was competent to stand trial.

{¶ 53} Dr. Martin and Dr. Stookey also addressed Mink's history of suicide attempts. Dr. Martin reported that Mink had contemplated suicide during the Christmas of 1997, but Mink did not actually attempt to kill himself. Dr. Martin also reported that Mink "claimed that he had not been preoccupied with thoughts of killing himself during his confinement in the Montgomery County Jail, adding that he had not made any overt suicidal threats or gestures while in the Jail." Moreover, Dr. Martin stated that BDI test results showed that Mink "was not preoccupied with suicidal thoughts." Dr. Stookey stated that "Mink expressed no spontaneous suicidal or homicide ideation and he denied the presence of such when asked directly. Mr. Mink reported he believes suicide is a sin and it is the one sin that cannot be forgiven."

{¶ 54} As discussed in proposition II, the psychologists' evaluations included references to Mink's earlier hospitalizations relayed by Mink himself. Thus, the trial court was also aware of this information before concluding that Mink was competent.

{¶ 55} There was no plain error. The defense stipulated to the "qualifications of the psychologists and also their findings in the reports" that Mink was competent and did not object to any aspect of either competency evaluation. Nor does Mink claim that his medical or mental health records, which were not reviewed, included information that would have changed his competency determination. Thus, any claims that Mink's competency evaluation was flawed because it did not include additional information about his depression, suicide attempts, or prior hospitalizations are purely speculative. Accordingly, we reject proposition III.

{¶ 56} In proposition of law V, Mink argues that greater scrutiny was required in determining his competency because he waived counsel and actively sought the death penalty. However, Mink has failed to identify the level of scrutiny he seeks.

{¶ 57} In *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, the Supreme Court explained the test for competency: a trial court must determine whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Internal quotations omitted.) The competency standard for standing trial is the same as the standard for pleading guilty or waiving the right to counsel. See *Godinez v. Moran* (1993), 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321. In relation to Mink's arguments, *Godinez* holds that "while States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the

Due Process Clause does not impose * * * additional requirements." Id. at 402, 113 S.Ct. 2680, 125 L.Ed.2d 321.

{¶ 58} R.C. 2945.37 and R.C. 2945.371 provide procedures for a trial court to follow in conducting competency evaluations and determinations. We set forth the test to determine whether a defendant is mentally competent to forgo the presentation of mitigating evidence in a capital case in *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231. *Ashworth* provides that a "defendant is mentally competent to forgo the presentation of mitigating evidence in the penalty phase of a capital case if he has the mental capacity to understand the choice between life and death and to make a knowing and intelligent decision not to pursue the presentation of evidence." Id., paragraph two of the syllabus. Moreover, *Ashworth* requires a trial court to conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary before deciding "whether the defendant is competent and whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings." Id. at 62, 706 N.E.2d 1231.

{¶ 59} The trial court went to great lengths before finding Mink competent. On its own motion, the trial court ordered that Mink undergo two competency evaluations. The trial court ordered these evaluations even though defense counsel disclosed that an independent psychologist had already found Mink competent. Thereafter, Dr. Martin and Dr. Stookey evaluated Mink, and Mink stipulated to their findings that he was competent.

{¶ 60} The trial court also conducted a comprehensive inquiry of Mink before finding that he was competent to waive counsel and represent himself and competent to waive his right to a jury trial. Moreover, prior to the penalty phase, the three-judge panel thoroughly questioned Mink before finding that he was competent to waive the presentation of mitigating evidence.

{¶ 61} We find that the trial court fully protected Mink's constitutional rights in determining his competency. Greater scrutiny was not required. Thus, we find that proposition V lacks merit.

{¶ 62} *Guilty plea.* In proposition of law IV, Mink argues that he did not enter a knowing and voluntary plea of guilty. However, these claims have no merit.

{¶ 63} First, Mink contends that the trial court failed to inquire about any medication that he was taking at the time of the plea or determine whether the medication had any effect on his willingness to plead guilty. Mink's assertions are incorrect.

{¶ 64} Before accepting Mink's pleas, the three-judge panel reviewed Dr. Martin's and Dr. Stookey's competency evaluations. Dr. Martin's report stated

that Mink "was receiving a prescription for an antidepressant agent, Effexor–XR (150 mg, each morning)." Further, Dr. Martin had reported Mink's statement that "without the medication, [he'd] be moody and reclusive, but with it [he's] okay." Moreover, prior to accepting Mink's pleas, the court asked him, "Are you under the influence of any drug, alcohol or other medication that in any way would affect your ability to understand what we're doing here today?" Mink replied, "No, your Honor."

{¶ 65} Crim.R. 11(C)(2) provides that a trial court "shall not accept a plea of guilty * * * without first addressing the defendant personally and * * * (a) Determining that the defendant is making the plea voluntarily, with understanding of the nature of the charges and of the maximum penalty involved."

{¶ 66} Additional inquiry is necessary into a defendant's mental state once a defendant seeking to enter a guilty plea has stated that he is under the influence of drugs or medication. See *United States v. Damon* (C.A.4, 1999), 191 F.3d 561, 565; *United States v. Cole* (C.A.3, 1987), 813 F.2d 43, 47; *United States v. Parra–Ibanez* (C.A.1, 1991), 936 F.2d 588, 595; cf. *United States v. Dalman* (C.A.8, 1993), 994 F.2d 537, 539 (concluding that district court had no duty to make further inquiries about the nature of defendant's medication and its effects when he was questioned adequately about his medications and nothing in the record suggested that defendant was not "fully in possession of his faculties").

{¶ 67} During the guilty-plea inquiry in *Damon*, the defendant informed the trial court that, following a suicide attempt, he was taking an antidepressant medication. *Damon*, 191 F.3d at 563. However, the court did not ask any followup questions about whether the medication had any actual effect on Damon's ability to enter a competent and voluntary plea, and it ultimately accepted the defendant's guilty pleas. *Damon* found that the trial court erred when "it failed to inquire about what effect, if any, Damon's medication had on his ability to make a voluntary plea and to understand the consequences." Id. at 565.

{¶ 68} Unlike in *Damon*, before the trial court accepted Mink's pleas, it was aware that Mink was taking an antidepressant medication but had been found competent. Here, the trial court could reasonably assume that Effexor–XR did not affect Mink's competency, or Dr. Martin and Dr. Stookey would have said so in their evaluations. Moreover, the trial court obtained assurance from Mink, who was then acting as his own attorney, that the medication had no effect on his ability to understand the court's proceedings. Under these circumstances, the trial court could properly find that Mink entered a voluntary plea.

{¶ 69} Second, Mink claims that his plea of guilty was not knowing and voluntary because the trial court misadvised him about the legal concept of mitigation.

{¶ 70} During the trial court's guilty plea inquiry, the trial court advised Mink of its sentencing responsibilities, and the following questioning ensued:

{¶ 71} "Judge Sunderland: Now, in the event that in any of these aggravated murder charges you are found guilty of the primary offense and you are found guilty of any one of the specifications to that particular charge, * * * the Court, the three-judge panel in this particular case, would then deliberate and decide * * * what penalty should be imposed.

{¶ 72} "And we've been over this with you before, but we'll go over it again, that the burden is on the State of Ohio to show ultimately * * * in the penalty phase that the aggravating circumstances outweigh the mitigating factors. And if they do that, then the death penalty will be imposed. Do you understand that?

{¶ 73} "The Defendant: I understand, your Honor.

{¶ 74} "Judge Sunderland: Do you understand what mitigating factors or what mitigation is?

{¶ 75} "The Defendant. Yeah, I do, Your Honor. It's items brought up in my defense to possibly offset any aggravating circumstances of the crime.

{¶ 76} "Judge Sunderland: I'm not sure it's quite in your defense, but it's as an excuse.

{¶ 77} "The Defendant: Right, it's an excuse, exactly.

{¶ 78} "Judge Sunderland: The defense would be brought up in the trial phase, and the excuse would be brought in the mitigation phase.

{¶ 79} "The Defendant: Yes.

{¶ 80} "Judge Sunderland: Let me read you a definition here: 'Mitigating factors are factors that, while they do not justify or excuse the crime, nevertheless in fairness and mercy, may be considered . . . as they call for a penalty less than death, or lessen the appropriateness of a sentence of death.' Do you understand that?

{¶ 81} "The Defendant: I understand that, sir." (Ellipsis sic.)

{¶ 82} In *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph one of the syllabus, we stated that "[m]itigating factors under R.C. 2929.04(B) are not necessarily related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." Thus, the trial court's shorthand definition of mitigation as an excuse for the crime strayed from the proper definition of mitigating evidence. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. However, when reviewed in its entirety, the trial court's inquiry adequately advised Mink about mitigating evidence and did not mislead him.

{¶ 83} Further, questioning Mink about mitigating evidence was unnecessary during the Crim.R. 11(C) guilty-plea inquiry. Those questions were properly addressed later during the penalty phase of the trial. Before finding that Mink was competent to waive mitigation and allowing him to waive the presentation of mitigating evidence, the trial court fully questioned Mink about mitigation during the *Ashworth* hearing. See *Ashworth,* 85 Ohio St.3d at 61, 67, 706 N.E.2d 1231.

{¶ 84} Finally, Mink argues that the trial court's failure to question him about the existence of possible mitigating factors, a failure that led Mink to conclude that he did not have much mitigation, resulted in a defective guilty plea. This claim also lacks merit.

{¶ 85} Crim.R. 11(C) does not require a trial court to question a defendant about the underlying facts of his mitigation before accepting his guilty plea. The *Ashworth* hearing was the appropriate forum to address defense mitigation, and the trial court questioned Mink about the strength of his mitigation during that hearing. Moreover, Mink does not challenge the adequacy of the trial court's inquiry during the *Ashworth* hearing.

{¶ 86} Based on the foregoing, we reject proposition IV.

{¶ 87} *Ineffective assistance of counsel.* In proposition of law VII, Mink recasts objections to his competency evaluations as claims of ineffective assistance of counsel.

{¶ 88} Reversal of convictions for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 89} First, Mink complains that his counsel were deficient by failing to object to the appointment of clinical psychologists to perform his competency evaluation, since he was under a physician's care and was being treated with antidepressant medication. However, this claim has no merit.

{¶ 90} Nothing in the record suggests that either Dr. Martin or Dr. Stookey was incapable of fully evaluating the effects of antidepressants on Mink's competency. Moreover, an independent expert also examined Mink and informed defense counsel that Mink was competent. Thus, trial counsel were not deficient by relying on their expert's opinion that Mink was competent, particularly since the defense would have shouldered the burden of proving that Mink was incompetent. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 164–165, 749 N.E.2d 226; *State v. Seiber* (1990), 56 Ohio St.3d 4, 12, 564 N.E.2d 408.

{¶ 91} Second, Mink argues that his counsel were deficient by not objecting to his competency evaluation because the two psychologists had failed to examine Mink's medical and mental health records before concluding that he was competent. We also reject this claim.

{¶ 92} As discussed in proposition II, review of Dr. Martin's and Dr. Stookey's competency evaluations confirms that they were thorough and complete. Both examiners conducted lengthy clinical interviews, obtained Mink's social and medical history, and administered a battery of psychological tests. Contrary to Mink's assertions, Dr. Martin addressed Mink's suicidal behavior and conducted further testing that showed that Mink was not preoccupied with suicidal thoughts. Dr. Stookey also interviewed Mink about suicide, but Mink denied the presence of spontaneous suicidal ideation. Dr. Martin also reported that Mink was taking 150 mg. of Effexor–XR. Although Dr. Martin did not specifically testify as to any possible effects of Effexor–XR on Mink's competency, defense counsel could reasonably presume that Dr. Martin would have discussed the effects of antidepressant medication on Mink's competency if they were a concern.

{¶ 93} Defense counsel also had the benefit of another independent psychologist's examination that found that Mink was competent. Under these circumstances, defense counsel were not deficient in failing to object to the adequacy of Dr. Martin's and Dr. Stookey's competency evaluations.

{¶ 94} Moreover, there was no prejudice. Mink has failed to make any claim that his medical or mental health records included any information that would have changed the results of his competency evaluations. Thus, it is purely speculative whether the psychologists' review of Mink's medical or mental health records would have made any difference in the outcome of his competency evaluations.

{¶ 95} Finally, Mink argues that his counsel were deficient by failing to assert his rights under international law. As discussed in proposition IX, Mink's rights under international law were not violated by imposition of the death penalty. Thus, his counsel were not deficient by failing to assert these rights at trial.

{¶ 96} Based on the foregoing, we overrule proposition VII.

{¶ 97} *Weighing and determination of the death penalty.* In proposition of law VI, Mink argues that the death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt. We will address this argument during our independent sentence evaluation.

{¶ 98} *Sentencing opinion.* In proposition of law VIII, Mink argues that the trial court's sentencing opinion failed to consider his psychological problems as a mitigating factor under R.C. 2929.04(B)(7), the catchall factor.

{¶ 99} The trial court's sentencing opinion evaluated Mink's history of ongoing depression as a mental disease or defect under R.C. 2929.04(B)(3). The three-judge panel mentioned that Mink had been treated in psychiatric units of local hospitals on two occasions, completed a 28–day residential drug treatment program, and was taking antidepressant medication. However, it concluded that neither Mink's depression nor his substance abuse established that Mink lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law under R.C. 2929.04(B)(3).

{¶ 100} The panel's sentencing opinion attributed "some weight" to Mink's "ongoing substance abuse" as an R.C. 2929.04(B)(7) factor. However, the trial court failed to mention whether Mink's psychological problems had any mitigating weight as a possible (B)(7) factor. This was error. *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136. However, during our independent review, we will correct this error. *State v. Landrum* (1990), 53 Ohio St.3d 107, 124, 559 N.E.2d 710. Thus, proposition VIII is overruled.

{¶ 101} In propositions of law IX through XVIII, Mink raises various constitutional and treaty-related challenges against Ohio's death penalty statutes. However, Mink failed to raise these claims at trial and thereby waived them. See *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus. Also, as discussed below, these challenges lack merit.

{¶ 102} In proposition of law IX, Mink claims that his execution will violate international law and treaties to which the United States is a party. However, these arguments lack merit. *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

{¶ 103} In proposition of law X, Mink argues that Ohio's death penalty statutory scheme violates the United States and Ohio constitutional prohibitions against arbitrary and unequal punishment. These claims are without merit. First, prosecutors have indictment discretion. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 169, 15 OBR 311, 473 N.E.2d 264. Second, Ohio's statutory scheme is not racially discriminatory. *State v. Steffen* (1987), 31 Ohio St.3d 111, 124–125, 31 OBR 273, 509 N.E.2d 383. Moreover, Mink asserts nothing to show that he has been racially discriminated against. Finally, we have previously rejected claims that the death penalty is unconstitutional because it is neither the least restrictive punishment nor an effective deterrent. *Jenkins,* 15 Ohio St.3d at 168, 15 OBR 311, 473 N.E.2d 264.

{¶ 104} In proposition of law XI, Mink claims that Ohio's death penalty statutes are unconstitutional because of unreliable sentencing procedures. However, we have rejected these arguments on many previous occasions. See *State v. Esparza* (1988), 39 Ohio St.3d 8, 12–13, 529 N.E.2d 192; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598; and *Jenkins,* 15 Ohio St.3d at 172–173, 15 OBR 311, 473 N.E.2d 264.

{¶ 105} In proposition of law XII, Mink argues that Ohio's death penalty statutes unconstitutionally fail to provide individualized sentencing because they require proof of aggravating circumstances in the guilt phase. This argument also lacks merit. See *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568; *State v. Henderson* (1988), 39 Ohio St.3d 24, 28–29, 528 N.E.2d 1237; *Jenkins,* 15 Ohio St.3d at 178, 15 OBR 311, 473 N.E.2d 264.

{¶ 106} In proposition of law XIII, Mink asserts that Ohio's death penalty scheme imposes an impermissible risk of the death penalty when a defendant exercises a right to a jury trial. We also find that this claim has no merit. See *State v. Buell* (1986), 22 Ohio St.3d 124, 138, 22 OBR 203, 489 N.E.2d 795, citing *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph one of the syllabus.

{¶ 107} In proposition of law XIV, Mink challenges Ohio's death penalty statutes because R.C. 2929.03(D)(1) requires submission of defense-requested presentence investigations ("PSI") and mental evaluations to the judge or jury. However, Mink declined a PSI and a mental-health evaluation prior to sentencing. Moreover, we have previously rejected these arguments. See *Buell,* 22 Ohio St.3d at 138, 22 OBR 203, 489 N.E.2d 795.

{¶ 108} In proposition of law XV, Mink disputes the constitutionality of R.C. 2929.04(A)(7), the felony-murder aggravating circumstance, because it repeats the definition of felony murder set forth in R.C. 2903.01(B). However, we rejected similar arguments in *Jenkins,* 15 Ohio St.3d at 178, 15 OBR 311, 473 N.E.2d 264; see, also, *Henderson,* 39 Ohio St.3d at 28–29, 528 N.E.2d 1237; *Coe v. Bell* (C.A.6, 1998), 161 F.3d 320, 349–350.

{¶ 109} In proposition of law XVI, Mink argues that language in R.C. 2929.03(D)(1) is unconstitutionally vague because it gives the sentencer unfettered discretion to weigh a statutory mitigating factor (see R.C. 2929.04[B]: "the nature and circumstances of the offense") as an aggravator. We have also previously overruled this claim. See *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596, citing *Tuilaepa v. California* (1994), 512 U.S. 967, 973–980, 114 S.Ct. 2630, 129 L.Ed.2d 750.

{¶ 110} We summarily reject Mink's challenge in proposition of law XVII to Ohio's death penalty proportionality review. See *State v. LaMar,* 95 Ohio St.3d

181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen,* 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 111} In proposition of law XVIII, Mink challenges his death sentence because the trial court did not consider all of the evidence of mitigation in his case. However, Mink was found competent to waive mitigation, and thus *Ashworth,* 85 Ohio St.3d at 63, 706 N.E.2d 1231, applies. Also, the trial court, sua sponte, searched the record for mitigating evidence and considered such mitigation before imposing the death sentence. Thus, we also reject this claim.

## INDEPENDENT SENTENCE EVALUATION

{¶ 112} Having considered Mink's propositions of law as required by R.C. 2929.05(A), we now independently review Mink's death sentences for appropriateness and proportionality. The evidence established that Mink was properly convicted of the death penalty specifications for aggravated murder, namely murder while committing or attempting to commit aggravated robbery under R.C. 2929.04(A)(7) and a "course of conduct" in killing two or more people under R.C. 2929.04(A)(5).

{¶ 113} We now weigh the aggravating circumstances against the mitigating factors contained in R.C. 2929.04(B). Mink made an unsworn statement but presented no other mitigating evidence during the penalty phase. However, the trial court reviewed Dr. Martin's and Dr. Stookey's competency evaluations and scoured the record for mitigating evidence before sentencing Mink to death.

{¶ 114} In his unsworn statement, Mink told the court, "[i]t has been my intention all along * * * to enter guilty pleas on all counts." Mink expressed his appreciation to the court for accepting his guilty pleas and said, "I do ask for the death penalty, to be handed a sentence of death. And that would be all."

{¶ 115} Other evidence that the court considered for mitigation showed that Mink was raised in the Dayton area and was the youngest of five children. Mink told Dr. Stookey that his mother was a "very forthright person" who "wore the pants in the family." She was reportedly a "strict disciplinarian" who was, "at the same time, fair."

{¶ 116} Mink attended Dayton area public schools and graduated from Colonel White High School in 1982. He also completed one year of coursework at Sinclair Community College. Mink never married and lived at home with his parents "most of [his] life."

{¶ 117} Mink was steadily employed with jobs at Kroger's for six years and Dayton newspapers for six years. He also worked for a gas company for four years until the summer of 2000. Mink claimed that he quit work because he was

"using alcohol and drugs pretty heavily." Mink also mentioned that he had been arrested for driving under the influence in 1997 and for public intoxication about eight months later.

{¶ 118} Mink started using marijuana at the age of 15 and started drinking alcohol and using cocaine when he was 25. Mink said his "addiction built over time" until he was using crack cocaine and alcohol on a daily basis. Mink also suffered from ongoing depression, which appeared to be related to his chemical dependency.

{¶ 119} Mink was treated for depression in early 1999 at Good Samaritan Hospital's Crisis Care facility and was prescribed the antidepressant, Effexor–XR. During the summer of 1999, Mink completed a 28–day residential drug treatment program. In April or May 2000, Mink was admitted for three days to the psychiatric treatment unit of Miami Valley Hospital because of his alcohol and drug use. He was briefly hospitalized in July or August 2000 because of an overdose of Alka–Seltzer Nite–Time medication and a couple of Ativans.

{¶ 120} Psychological testing showed that Mink was in the average to high average range of intelligence. Mink's verbal IQ was 98 on the Wechsler Adult Intelligence Scale-3d Edition ("WAIS–III"). Moreover, Mink did not exhibit symptoms usually associated with either mental illness or mental retardation.

{¶ 121} We find that the statutory mitigating factors are generally inapplicable here, including R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(4) (youth of the offender; Mink was 37 at the time of the offenses); and (B)(6) (accomplice only).

{¶ 122} We give some weight to the R.C. 2929.04(B)(5) factor, since Mink has no "significant history of prior criminal convictions and delinquency adjudications." However, Mink acknowledged that he had been arrested for driving under the influence in 1997 and public intoxication about eight months later. See State v. D'Ambrosio (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710 (lack of significant prior criminal record entitled to some weight despite two previous DUIs); cf. State v. Hartman (2001), 93 Ohio St.3d 274, 306, 754 N.E.2d 1150 (lack of significant criminal background entitled to little weight, since defendant had five previous DUIs).

{¶ 123} Mink's history of depression does not qualify as an R.C. 2929.04(B)(3) factor because there was no evidence that Mink's condition caused him to lack "substantial capacity to appreciate the criminality of [his] conduct." See Bey, 85 Ohio St.3d at 508, 709 N.E.2d 484 (defendant's long-term depression did not establish the [B][3] mitigating factor).

{¶ 124} However, under the catchall provision, R.C. 2929.04(B)(7), we give weight to Mink's history of ongoing depression, his alcohol and crack cocaine

dependency, his attempts to address his drug and alcohol abuse problems through psychiatric and drug treatment programs. See *State v. Smith* (2000), 87 Ohio St.3d 424, 447, 721 N.E.2d 93.

{¶ 125} We also give some weight under (B)(7) to Mink's cooperation with the police and his guilty pleas. His "willingness to step forward and take responsibility for his actions, without any offer of leniency by the state, indicates a person who is remorseful for the crimes he has committed." *Ashworth*, 85 Ohio St.3d at 72, 706 N.E.2d 1231.

{¶ 126} However, Mink did not express any remorse for killing his parents during his unsworn statement. Moreover, Dr. Martin reported, "Mink informed me * * * that he was not preoccupied with any feelings of guilt or remorse about his actions at the time of the alleged offense." Mink argues that his actions speak much louder than his words in demonstrating remorse. However, Mink's actions fail to demonstrate remorse. After killing his parents, Mink stole money from them and sold his parents' personal belongings to purchase more crack cocaine and to support himself until he surrendered to the police. Nonetheless, Mink appears to recognize that he committed unspeakable crimes by pleading guilty, waiving mitigation, and requesting that he receive the death penalty.

{¶ 127} We find that Mink's history, character, and background provide modest mitigating value. Mink graduated from high school, attended community college for about a year, and was gainfully employed for most of his adult life. Otherwise, his character offers no redeeming features.

{¶ 128} Furthermore, we find nothing in the nature and circumstances of these murders to mitigate Mink's offenses. In order to obtain funds to buy crack cocaine, Mink murdered both of his parents while they were asleep by repeatedly hitting them with a hammer, stabbing them, and strangling his mother with an electric cord. Mink then stole $7 from his father's wallet and used his mother's ATM card to obtain $10 to purchase crack cocaine. Over the next couple of days, Mink sold his parents' furniture and other personal belongings to obtain more drugs.

{¶ 129} Upon weighing the aggravating circumstances against the mitigating factors, we find that the aggravating circumstances as to each aggravated murder outweigh the mitigating factors beyond a reasonable doubt. Mink's course of conduct and the robbery-murder of his elderly parents are grave circumstances. Moreover, the mitigating evidence pales in comparison to the aggravating circumstances of these murders. Mink's history and background and his lack of a significant criminal record, as well as the other mitigation, are easily outweighed by these serious aggravating circumstances.

{¶ 130} We find that the death penalty imposed in this case is both appropriate and proportionate when compared with other "course of conduct" murders. See

*State v. Hughbanks,* 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 145; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 162; and *State v. Tibbetts,* 92 Ohio St.3d 146, 174, 749 N.E.2d 226. It is also appropriate and proportionate when compared with the sentence in other robbery-murder cases. See *State v. Group,* 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 173; *State v. Thomas,* 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 124; and *State v. Hill* (1995), 73 Ohio St.3d 433, 448, 653 N.E.2d 271.

{¶ 131} Accordingly, we affirm Mink's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

———————————

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, Cheryl A. Ross and Johnna M. Shia, Assistant Prosecuting Attorneys, for appellee.

Gary W. Crim and Frank A. Malocu, for appellant.