THE STATE OF OHIO, APPELLEE, *v*. FERGUSON, APPELLANT.

[Cite as *State v. Ferguson,* 108 Ohio St.3d 451, 2006-Ohio-1502.]

(No. 2003–1904—Submitted November 8, 2005—Decided April 12, 2006.)

ALICE ROBIE RESNICK, J.

{¶ 1} Darrell W. Ferguson, defendant-appellant, was convicted of, and sentenced to death for, the aggravated murders of Thomas King, Arlie Fugate, and Mae Fugate. Ferguson raises 16 propositions of law. Finding none meritorious, we affirm his convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have compared Ferguson's sentences of death to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm Ferguson's death sentences.

*Facts*

{¶ 2} In July 1999, Ferguson was convicted of burglary and sentenced to two years in prison. On November 8, 2001, Ferguson, while on postrelease control, was ordered to complete a substance-abuse treatment program at Talbert House in Cincinnati.

{¶ 3} On December 20, 2001, Ferguson was granted a two-day pass to visit his mother at her Dayton home. The pass was effective from 9:00 a.m. on December 21 until 12:00 p.m. on December 23, when he was required to return to Talbert House. Ferguson went to his mother's Dayton home, but he did not return to Talbert House when his pass expired.

{¶ 4} Around 4:00 a.m. on December 23, 2001, Ferguson broke into the Dayton apartment of James Nicholson, a double amputee in a wheelchair, and William Ferrell. Once inside the apartment, Ferguson knocked Nicholson to the ground, removed Nicholson's wallet from his pants pocket, and took cash from the wallet. As he left, Ferguson warned Nicholson and Ferrell that if they called the police, he would return and kill them.

{¶ 5} At some time on December 25, 2001, Ferguson went to Thomas King's home in east Dayton. Ferguson knew the 61–year–old King because Ferguson's

mother had been married to King's brother. King was disabled and could walk only with crutches.

{¶ 6} Ferguson knocked on the door, and King, who was alone, let Ferguson into the house. After Ferguson and King talked for a time, Ferguson attacked King, repeatedly stabbed him with a kitchen knife, and kicked and stomped King with his steel-toed boots. Following the attack, Ferguson took a 13–inch television, a 19–inch television, and a stereo "boom box" and fled.

{¶ 7} According to his later confession, Ferguson then went to a Meijer's store and purchased some gold spray paint to "huff," i.e., to inhale the paint vapors for a quick high. Ferguson then went to an area underneath a bridge and "tried to put a bread bag over [his] face to go ahead and just do [himself] in because [he] knew what [he] did was wrong."

{¶ 8} On the evening of December 26, Ferguson went to the home of 68–year–old Arlie Fugate and 69–year–old Mae Fugate in east Dayton. Ferguson knew them because Ferguson's family had once lived near the Fugate home.

{¶ 9} Ferguson knocked on the Fugates' door and asked to use their bathroom. The Fugates let Ferguson inside their house. After Ferguson came out of the bathroom, he took a knife from the kitchen and attacked the Fugates. Ferguson repeatedly stabbed, stomped, and kicked both of them with his boots. Following the attack, Ferguson stole Mae's wedding ring and other jewelry, Arlie's wedding band, and loose change that was kept in jars and jugs in the house. Ferguson then left the house.

{¶ 10} After leaving the Fugate home, Ferguson walked to Sid's Towing Service. Around 1:00 a.m. or 1:30 a.m. on December 27, Ferguson approached Jeffrey Fleming Jr., an acquaintance who worked at Sid's Towing. Ferguson asked Fleming for a ride to another location in Dayton, and Fleming drove him there. Fleming noticed blood on Ferguson's jeans, but Ferguson told Fleming that the blood was from a fight.

{¶ 11} After the murders, Ferguson traded several of the stolen items to Vicki Miller for crack cocaine. Miller identified Ferguson from a photo array as the man who had made the trade. Police recovered this property from Miller's residence in Dayton, from Miller's father, and from a Dayton pawn shop. The 13–inch television was never recovered.

{¶ 12} Around noon on December 27, Ferguson went to the Dayton home of Ricky Webb, an acquaintance. Webb, Dwayne Abney, and Willie Townsend were at the house when Ferguson arrived. Ferguson said that he wanted to watch the noon headlines on television. The group then watched news coverage of the three murders. Ferguson said that he had killed the victims at both locations. In describing what happened, Ferguson said that "one guy went to pull a weapon

on him. * * * He said he let him have it. And * * * that's what they * * * had coming to them for trying to pull a weapon on him."

{¶ 13} While watching the news, Ferguson asked how to get blood out of clothes. Townsend told him to soak the clothes in cold water. Abney noticed that there were darkish brown stains on the bottom of Ferguson's jeans and that Ferguson was wearing black, steel-toed boots.

{¶ 14} Later on December 27, Ferguson went to the Dayton home of Irma Hess, where he washed his pants to get the blood out. Ferguson remained at the Hess home until he was arrested the next day.

{¶ 15} Around 8:00 p.m. on December 26, police were dispatched to the King home after a friend found King's body. Police noticed that the rear door to the house was ajar, but found no signs of forced entry.

{¶ 16} King's body, found on the dining room floor, had sustained multiple knife wounds and a severe beating to his face. Two kitchen knives were found near King's body. The wall near King's body was heavily covered with blood spatter. Police also found a distinctive bloody footprint on King's pants, and similar bloody footprints were found on the carpet near his body.

{¶ 17} The dining room area had been rifled, but the rest of the house showed no signs of being ransacked. Police later determined that a 19-inch television had been stolen from the dining room, a stereo "boom box" from the kitchen, and a 13-inch television from the bedroom.

{¶ 18} Around 9:00 a.m. on December 27, James Cornett, the Fugates' son, discovered Arlie's and Mae's bodies on their living room floor. Police arriving at the Fugate home found the front door ajar, but found no signs of forced entry.

{¶ 19} The bodies of Arlie and Mae were found next to each other in the living room. Arlie and Mae sustained multiple stab wounds and had been badly beaten. It appeared that the bodies had been arranged in the center of the room, and that Arlie had been dragged by his shoulders to that position, because his pants and underwear were pulled down to his hips. A bloodstained kitchen knife was found near the bodies. Police also found bloodstains near the front door, on living room furniture and carpeting, and on a dining room chair and carpeting. A bloody foot impression was also left on Arlie's face.

{¶ 20} The living room had been ransacked. Arlie's wallet was next to his feet, and its contents were scattered on the floor. A fanny pack and Mae's wallet were lying next to Arlie's head, and her wallet had been rifled through. After talking to Cornett, police learned that Mae's rings and Arlie's wedding band had been taken from their hands. Jugs and jars filled with coins were also missing from the home.

{¶ 21} As the investigation progressed, Ferguson was identified as the primary suspect. On December 28, the police obtained an arrest warrant for Ferguson for the Nicholson robbery and learned that Ferguson was staying at the Hess home.

{¶ 22} At 3:00 p.m. on December 28, Detectives Gary Dunsky, Doyle Burke, and another uniformed police officer went to the Hess home. When the police came to the door, Irma Hess confirmed that Ferguson was inside. The police then entered the house, placed Ferguson under arrest, and took him to the police station.

{¶ 23} At the station, Det. Burke advised Ferguson of his *Miranda* rights, and he waived those rights. Subsequently, Ferguson provided the police with a detailed account of the murders reflecting facts already described. Ferguson also gave a videotaped confession.

{¶ 24} Denise K. Rankin, a forensic scientist, conducted DNA testing of bloodstains on Ferguson's boots. DNA testing of one bloodstain showed "a mixture where Arlie Fugate and Thomas King * * * are possible contributors." DNA testing of another bloodstain on the boots showed "a mixture where Arlie Fugate is a possible contributor." According to Rankin, the probability of an individual contributing to the mixed profile of this second stain is one in 62,770,000 Caucasians, one in 43,220,000 African Americans, one in 40,210,000 Southeastern Hispanics, and one in 21,120,000 Southwestern Hispanics. Ferguson is a Caucasian.

{¶ 25} Daniel Lee Bibby, an expert in trace analysis, compared sole prints from Ferguson's boots with bloody impressions found on the victims' bodies and at the King and Fugate homes. Bibby concluded that the imprint left on Arlie's face was consistent with Ferguson's right boot heel. Bibby also found that shoe impressions on two carpet samples from King's home were consistent with the tread pattern from Ferguson's right boot. Finally, Bibby found that impressions from "red-brown material" on King's pants were similar to an element in the tread pattern of Ferguson's boots.

{¶ 26} Dr. Russell Uptegrove, Deputy Coroner for Montgomery County, performed or supervised autopsies of all three victims. Mae suffered numerous stab wounds and blunt-force injuries to the head and face. She died as the result of "multiple stab wounds of the back." Arlie suffered numerous blunt-force facial injuries that were consistent with being kicked or stomped. Arlie died from "[m]ultiple stab wounds of the chest." King also suffered numerous blunt-force injuries to the head consistent with being kicked or stomped with steel-toed boots. He suffered six stab wounds in the chest caused by a single-edge knife. King died as the result of multiple sharp and blunt-force injuries.

{¶ 27} Before trial, Ferguson wrote letters to the judge and the prosecutor. In a January 3, 2003 letter, Ferguson informed the prosecutor, "I committed all 3 murders[,] burglarys, [and] robberys." (Sic.) Ferguson also wrote, "I wish to get this over with as soon as possible. * * * I Darrell Wayne Ferguson wishes to seek the Death penalty." (Sic.)

{¶ 28} In a January 7, 2003 letter, Ferguson wrote the trial judge that when he went to King's home, he "hit [King] and beat hime to death and then stabbed hime. [He] took the t.v. and sold them." (Sic.) As to the Fugate murders, Ferguson stated, "[I] club[b]ed [Mae] in the forehead with a metal and wooden candle stick holder. I beat her down untill she could not move. I beat arlie to death as well and then stabbed both of them." (Sic.) Ferguson wrote, "[W]hat is done is done and if i could bring them back i wouldn't. I have no Remorse for what i did." (Sic.) He also wrote, "[I] * * * is asking you in my right state of mind would you please Find it in good will to give me the Death penalty." (Sic.)

### Case history

{¶ 29} A grand jury indicted Ferguson on six counts of aggravated murder. Count 6 charged Ferguson with the aggravated murder of King while committing aggravated burglary, and Count 7 charged him with the aggravated murder of King while committing aggravated robbery. Count 11 charged Ferguson with the aggravated murder of Mae while committing aggravated burglary, and Count 12 charged him with the aggravated murder of Mae while committing aggravated robbery. Count 13 charged Ferguson with the aggravated murder of Arlie while committing aggravated burglary, and Count 14 charged him with the aggravated murder of Arlie while committing aggravated robbery.

{¶ 30} The six counts of aggravated murder each contained five identical death-penalty specifications: murder to escape detection or apprehension, R.C. 2929.04(A)(3); murder while at large after breaking detention, R.C. 2929.04(A)(4); murder as a "course of conduct" in killing two or more people, R.C. 2929.04(A)(5); murder while committing or attempting to commit aggravated burglary, R.C. 2929.04(A)(7); and murder while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7).

{¶ 31} Ferguson was also indicted for escape in Count 1, aggravated burglary of Nicholson's residence in Count 2, robbery of Nicholson in Count 3, aggravated burglary of the King home in Count 4, and aggravated robbery of King in Count 5. Additionally, Ferguson was charged with aggravated burglary of the Fugate home in Count 8, aggravated robbery of Mae in Count 9, aggravated robbery of Arlie in Count 10, and evidence tampering in Count 15.

{¶ 32} Ferguson waived a jury trial and pleaded guilty to all counts and specifications. After reviewing a court-ordered competency evaluation and ques-

tioning Ferguson about his decisions, the trial court ruled that Ferguson was competent to stand trial and that he had knowingly, intelligently, and voluntarily waived his right to a jury trial.

{¶ 33} The three-judge panel accepted Ferguson's guilty plea and found Ferguson guilty on all the noncapital counts, and the state presented evidence of Ferguson's guilt on the capital counts· pursuant to R.C. 2945.06 and Crim.R. 11(C)(3)(c). See *State v. Green* (1998), 81 Ohio St.3d 100, 104, 689 N.E.2d 556 (holding that in a capital case, a three-judge panel accepting a guilty plea must hear evidence to determine whether the defendant is guilty of aggravated murder beyond a reasonable doubt). Having found Ferguson to be competent, the three-judge panel found Ferguson guilty of all counts and specifications. Ferguson waived the presentation of mitigating evidence. After finding that Ferguson was competent to waive mitigation, the three-judge panel sentenced Ferguson to death for the murders and to prison for the remaining offenses.

{¶ 34} Ferguson now appeals to this court as a matter of right.

{¶ 35} *Competency evaluation.* In his first, second, third, and fourth propositions of law, Ferguson challenges the sufficiency of his competency evaluation.

{¶ 36} In his first proposition of law, Ferguson claims that the psychologist who examined him was not qualified to evaluate his competency, because Ferguson had been prescribed psychotropic medications. Ferguson argues that only a psychiatrist licensed to prescribe medication would be qualified to render an opinion on his competence.

{¶ 37} Before trial, Ferguson informed the court that he wished to waive a jury trial, plead guilty, and waive mitigation. The trial court, sua sponte, ordered an evaluation of Ferguson to determine his "general competency and competency to waive mitigation." The defense then requested that a psychiatrist be appointed as one of the examiners. On March 31, 2003, the trial court appointed Dr. Barbra A. Bergman, a clinical psychologist, to conduct a competency evaluation.

{¶ 38} During April and May 2003, Dr. Bergman conducted her competency evaluation of Ferguson. On May 21, 2003, Dr. Bergman completed a written report finding that Ferguson was competent to stand trial and competent to waive mitigation. The defense then requested that a psychiatrist be appointed to provide a second opinion on Ferguson's competency. However, the trial court denied this request and thereafter found that Ferguson was competent.

{¶ 39} R.C. 2945.371(A) provides that a competency examination shall be conducted by an "examiner," defined by R.C. 2945.37(A)(2)(a) as either a "psychiatrist or a licensed clinical psychologist." The appointment of Dr. Bergman, a licensed clinical psychologist, met that criterion.

{¶ 40} Dr. Bergman was fully qualified to evaluate whether Ferguson's prescription medications would have affected his competency. In a very similar case, *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 34–35, this court held that clinical psychologists appointed to conduct separate competency examinations were qualified to evaluate the effects of antidepressant medication in evaluating the defendant's competency.

{¶ 41} Moreover, Dr. Bergman's report shows that before concluding that Ferguson was competent, she was aware that Ferguson was taking or had taken various prescription medications. Dr. Bergman learned from Ferguson that he had been "prescribed Depakote (a mood stabilizer), Effexor (an antidepressant), Ativan (to decrease agitation), and Risperdal (to control aggressive behavior)." Ferguson told Dr. Bergman that he had taken those medications for 14 months but had refused to take them for the two and a half months that he had been in jail. Ferguson said that taking the medication had resulted in "drooling, acid reflux, and 'feeling bad.'" He also said that "the doctors did not care about the side effects, because the medication kept him from 'killing someone and going into black rages.'" However, Ferguson reported that since he stopped taking these medications, "he is better able to focus, feels more motivated, and feels better about himself."

{¶ 42} Dr. Bergman also conducted a mental-status examination and other psychological tests to evaluate Ferguson's mental state. When Ferguson was not taking his medication in jail, he displayed "no symptomatic behaviors" and "no active symptoms of a major mental disorder." Dr. Bergman then made her primary diagnosis that Ferguson had an antisocial-personality disorder. Thus, Dr. Bergman was aware that Ferguson had been prescribed various medications and that he had ceased taking those medications, and she considered those factors before concluding that Ferguson was competent.

{¶ 43} Further, the defense had an alternative means of bringing the effect of prescription medications to the court's attention. Before the competency evaluation, Dr. Douglas Mossman, a psychiatrist and defense consultant, examined Ferguson. Dr. Mossman reviewed Ferguson's medical records and was aware of prescription medications that Ferguson was taking or had taken. Thus, Dr. Mossman was available to alert the defense to any issues regarding the effects of prescription medication on Ferguson's competency. However, the defense never mentioned to the court whether Dr. Mossman had any concerns on that score.

{¶ 44} Moreover, the court received Ferguson's own assurances that his ability to understand the proceedings was not adversely affected by any prescription medication. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 37. After receiving Dr. Bergman's competency evaluation, the trial court questioned Ferguson about taking prescription medications before accepting his

request to waive a jury trial. The trial court asked Ferguson whether he was "under the influence of any alcohol, drugs, or medication that would impair—stand in the way of—[his] ability to understand [the court] here today and to think logically." Ferguson answered, "No, sir."

{¶ 45} The three-judge panel also questioned Ferguson about taking prescription medications before accepting his guilty plea. The panel asked Ferguson, "[Are] you[ ] under the influence of any alcohol, drug, or medication that would impair – meaning, stand in the way of – your ability to understand me or to think clearly[?] Any medication that you're on or is there anything that's blocking your ability to comprehend and dialogue with me here today?" Ferguson replied, "No, sir."

{¶ 46} Finally, even if Ferguson had been taking psychotropic medication, this fact alone would not have affected the court's findings on competency. R.C. 2945.37(F) provides that a "court shall not find a defendant incompetent to stand trial solely because the defendant is * * * receiving or has received psychotropic drugs or other medication." See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 38. Indeed, a defendant may be emotionally disturbed or even mentally ill and yet competent to stand trial. Id. at ¶ 38, citing *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016.

{¶ 47} Based on the foregoing, we overrule Ferguson's first proposition.

{¶ 48} In his second proposition of law, Ferguson argues that the court erred in finding that he was competent before previously ordered neuropsychological testing of Ferguson had been completed.

{¶ 49} In a pretrial motion, the defense requested funds to conduct a thorough neuropsychological test battery, a sleep-deprived electroencephalogram ("EEG"), a lumbar puncture, and a positron emission tomographic ("PET") study of Ferguson's brain. Dr. Mossman, the defense psychiatric expert, submitted an affidavit stating that such testing would assist in evaluating Ferguson's mental status and whether he suffered from brain damage or mental retardation. In an order dated February 25, 2003, the trial court approved the defense request.

{¶ 50} The record is unclear whether the additional neuropsychological testing on Ferguson was ever conducted. In a pretrial hearing on March 13, 2003, Ferguson informed the court that he intended to plead guilty and waive mitigation. The focus of the trial proceedings then shifted to whether Ferguson was competent to waive a jury trial, plead guilty, and waive mitigation. During the remainder of the trial, the defense neither mentioned whether neuropsychological testing was conducted nor disclosed the test results if such testing had been completed.

{¶ 51} Moreover, Ferguson failed to object at trial to the competency evaluation based on claims that neuropsychological testing was not completed or that test results were not considered. Thus, Ferguson has waived all but plain error. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus; *State v. Underwood* (1983), 3 Ohio St.3d 12, 13–14, 3 OBR 360, 444 N.E.2d 1332.

{¶ 52} There was no plain error. R.C. 2945.371(G) requires the examiner to file a written report with the court that shall include (1) the examiner's findings, (2) the facts on which the findings are based, in reasonable detail, and (3) the findings or recommendations applicable to the issue of the defendant's competency to stand trial, i.e., whether the defendant is capable of understanding the nature of the proceedings and of assisting in his or her defense. Dr. Bergman's competency evaluation met these criteria.

{¶ 53} Dr. Bergman clinically interviewed Ferguson for nine and one-half hours over five days. During these interviews, Ferguson provided Dr. Bergman with a detailed history of his family background, his history of substance abuse, and his mental problems. Dr. Bergman also administered various psychological tests, including the Wechsler Adult Intelligence Scale–III, the Minnesota Multiphasic Personality Inventory–2, and the Personality Assessment Inventory. Additionally, Dr. Bergman reviewed Ferguson's medical records from Dr. Robert Hardman, a pediatric neurologist, the Miami Valley Hospital, Greene Memorial Hospital, and Talbert House. She also considered police reports and other court documents relating to the charged offenses. Thus, Dr. Bergman considered an abundance of information about Ferguson's medical and psychiatric history.

{¶ 54} Moreover, the defense controlled whether additional neurological testing of Ferguson was completed and whether the test results were provided to Dr. Bergman and the court. Thus, Dr. Bergman could consider evidence of neurological testing only if the defense disclosed the results of such testing. However, this was not done.

{¶ 55} Finally, Ferguson does not reveal how additional neurological testing would have changed the results of his competency evaluation. It is purely speculative whether additional testing would have made any difference in the outcome of his competency evaluation. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 94.

{¶ 56} Based on the foregoing, we overrule Ferguson's second proposition.

{¶ 57} In his third proposition of law, Ferguson argues that the trial court's findings of competency were flawed because the evaluations did not adequately address medical diagnoses requiring psychotropic medication, his suicide attempts, and his hospitalizations. However, this claim also lacks merit.

{¶ 58} In the competency evaluation, Dr. Bergman discussed Ferguson's medical diagnoses. After reviewing Ferguson's medical records, Dr. Bergman informed the court that Ferguson "has been given a number of different diagnoses since childhood. Some of the diagnoses were apparently supplied by Mr. Ferguson (i.e. Multiple Personality Disorder and Schizophrenia) and have not been given by qualified mental health professionals. Dr. Robert Hardman, M.D., a pediatric neurologist, treated Ferguson with medication for ADHD [Attention Deficit Hyperactivity Disorder] and Bipolar Disorder. He also diagnosed [a] Conduct Disorder. On two occasions, during contacts at Miami Valley Hospital, Mr. Ferguson was diagnosed with drug-induced psychotic reactions." Dr. Bergman also reported that Ferguson had a long history of substance abuse and treatment in various substance-abuse programs.

{¶ 59} Dr. Bergman's evaluation discussed various prescription medications that Ferguson had taken. These included Ritalin and Wellbutrin (an antidepressant) that Ferguson had been prescribed as a child. Additionally, Dr. Bergman noted that his prescription for Effexor was refilled when he was sent to Talbert House.

{¶ 60} Dr. Bergman also reported medications that Ferguson said had been prescribed for him, including "Depakote (a mood stabilizer), Effexor (an antidepressant), Ativan (to decrease agitation) and Risperdal (to control aggressive behavior)." Ferguson said that he had taken these medications for 14 months, but he has refused to take them while in jail, with the result that he feels better, more motivated, and more focused.

{¶ 61} Dr. Bergman's report also addressed Ferguson's suicide attempts. Dr. Bergman reported that "when he was 19 years of age (1997), he made a suicide attempt by eating rat poison and was hospitalized in the psychiatric unit at Miami Valley Hospital for three weeks. He indicated that he was hospitalized at Miami Valley Hospital because of suicidal feelings several times in 1997. Then, according to [Ferguson], he began getting into a lot of legal trouble, so he 'stopped feeling suicidal.'" Dr. Bergman also reported that Ferguson "denied any current thoughts or impulses for self harm."

{¶ 62} Finally, Dr. Bergman's report discussed Ferguson's hospitalizations. He was treated at Miami Valley Hospital in 1997 for two drug-induced psychotic episodes, an emergency-room contact after a suicide attempt, and an emergency-room contact with referral for outpatient substance-abuse treatment. Ferguson was also evaluated at Greene Memorial Hospital. Dr. Bergman reported that, after an intake evaluation, Ferguson was referred to a substance-abuse treatment program, but he did not follow up on the referral. Additionally, Dr. Bergman reported that while Ferguson was on parole during 2001, he admitted himself into

a drug-detoxification program at the Kettering Medical Center to "avoid 'getting slammed' by his Probation Officer for having a dirty urine."

{¶ 63} Thus, Dr. Bergman's report informed the court of Ferguson's various diagnoses and prescription medications, his suicide attempts, and his hospitalizations. After carefully taking all these factors into consideration, Dr. Bergman found that Ferguson was competent.

{¶ 64} Ferguson does not explain how his competency evaluation suffered from any lack of information about his diagnoses, psychotropic medication, suicide attempts, or hospitalizations. Nor does he claim that his medical or mental-health records included information that would have changed his competency determination. Thus, we reject Ferguson's claim that his competency evaluation was flawed. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 55.

{¶ 65} Moreover, as discussed regarding Ferguson's first proposition of law, Dr. Mossman, the defense psychiatric consultant, was available to challenge Dr. Bergman's competency evaluation. However, the defense chose not to challenge Dr. Bergman's findings by calling Dr. Mossman as a witness.

{¶ 66} Finally, in addition to Dr. Bergman's report, the trial court had the opportunity to observe Ferguson's demeanor and behavior in court. Both the trial court and the three-judge panel questioned Ferguson extensively before finding that he was competent. See *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706 N.E.2d 1231. We find that neither the trial court nor the three-judge panel abused its discretion in finding Ferguson competent, because reliable and credible evidence supported these findings. See *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33.

{¶ 67} Based on the foregoing, we reject Ferguson's third proposition.

{¶ 68} In his fourth proposition of law, Ferguson argues that because he actively sought the death penalty, greater scrutiny was required in determining his competency.

{¶ 69} We have previously held that greater scrutiny is not required in conducting a competency evaluation merely because the defendant seeks the death penalty. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 56–61. We find no basis for overturning that ruling.

{¶ 70} Ferguson argues that *Mink* is distinguishable because two psychologists conducted separate competency evaluations in that case and only one psychologist evaluated Ferguson. However, we reject this argument. First, the trial court was not required to appoint more than one examiner to conduct the competency evaluation. See R.C. 2945.371(A). Second, Ferguson fails to show how the appointment of a second examiner would have changed the outcome of his

competency evaluation. Moreover, Dr. Mossman, the defense psychiatric consultant, evaluated Ferguson and was available to challenge the findings of Dr. Bergman, but never did so. Thus, it is purely speculative whether a second examiner would have made a difference in the outcome of Ferguson's competency evaluation.

{¶ 71} Furthermore, the trial court went to great lengths before finding that Ferguson was competent. On its own motion, the trial court ordered that Ferguson undergo a competency evaluation. Thereafter, Dr. Bergman evaluated Ferguson and found that he was competent. The trial court then thoroughly questioned Ferguson before finding that he was competent to stand trial and competent to waive his right to a jury trial.

{¶ 72} After the three-judge panel assembled, the court questioned Ferguson at length before finding that he was competent to stand trial, to waive his right to a jury trial, and to plead guilty. Moreover, before the penalty phase, the three-judge panel questioned Ferguson again before finding that he was competent to waive mitigation.

{¶ 73} Based on the foregoing, Ferguson's fourth proposition is overruled.

{¶ 74} *Ineffective assistance of counsel.* In his sixth proposition of law, Ferguson raises several claims of ineffective assistance of counsel.

{¶ 75} Reversal of convictions for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense in such a way as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 76} First, Ferguson claims that his counsel were deficient in failing to request a psychiatrist to conduct the evaluation. However, the record shows that trial counsel did request the appointment of a psychiatrist. Following Dr. Bergman's evaluation, trial counsel requested that Dr. Douglas Lehrer, a psychiatrist, provide a second opinion on Ferguson's competency. Moreover, after the three-judge panel was assembled, trial counsel renewed their request that a psychiatrist provide a second opinion on Ferguson's competency. Thus, we find that this claim of ineffectiveness lacks merit.

{¶ 77} Second, Ferguson argues that his counsel were deficient in failing to object to the competency evaluation because the examiner completed it without the benefit of Ferguson's psychiatric records. Dr. Bergman stated that she reviewed Ferguson's medical records from Dr. Hardman, the Miami Valley Hospital, Greene Memorial Hospital, and Talbert House. However, Ferguson

does not identify other medical records that Dr. Bergman failed to consider, and this claim is therefore speculative. Thus, we also reject this ineffectiveness claim.

{¶ 78} Third, Ferguson asserts that his counsel were ineffective by not objecting to the competency evaluation because it failed to discuss the possible impact of medication on Ferguson's original decision to request the death penalty. Dr. Bergman reviewed Ferguson's medical records and considered the medications that he was prescribed but no longer taking. As discussed regarding his first proposition of law, Ferguson told Dr. Bergman that he stopped taking his prescription medications during the two and one-half months that he was in pretrial confinement. Ferguson reported that after he stopped taking these medications, "he is better able to focus, feels more motivated, and feels better about himself." Defense counsel could reasonably presume that the effects of Ferguson's medications on his decision to request the death penalty were not a concern. See State v. Mink, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 92. Accordingly, we find that counsel were not deficient for failing to raise this objection.

{¶ 79} Fourth, Ferguson contends that his counsel were ineffective in failing to object to the competency evaluation because it did not address the medical diagnoses that caused a physician to prescribe psychotropic medications. He also claims that his counsel were deficient by stipulating to Dr. Bergman's testimony and thus giving up the opportunity to cross-examine her.

{¶ 80} Ferguson does not explain how his counsel's failure to object to the failure to link his prescription medications to a specific medical diagnosis would have made a difference in the outcome of his competency evaluation. Dr. Mossman, the defense psychiatric consultant, was aware of Ferguson's medications, reviewed his medical records, and was aware of his medical diagnoses. Thus, counsel may have decided to forgo an objection based upon information obtained through their own expert. Given the "strong presumption" that counsel's performance constituted reasonable assistance, we reject this allegation. State v. Bradley, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 81} Moreover, counsel were not ineffective in stipulating that Dr. Bergman "would be qualified as an expert and she would testify in accordance with her report." The state would have likely called Dr. Bergman as a witness if the defense had not agreed to stipulate. By stipulating, the defense avoided the danger of reiterating the state's evidence and eliciting further expert testimony that might be damaging. Thus, counsel's action was a "legitimate tactical decision" that does not constitute ineffective assistance of counsel. See State v. Foust, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 90; State v. Hanna, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 121–123.

{¶ 82} Finally, Ferguson claims that his counsel were deficient in failing to assert his rights under international law. As discussed regarding Ferguson's seventh proposition, his rights under international law were not violated by imposition of the death penalty. Thus, we find that counsel were not deficient by failing to assert these rights at trial. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 95.

{¶ 83} ***Weighing of aggravating circumstances and mitigating factors.*** In his fifth proposition of law, Ferguson argues that the death penalties must be vacated because the aggravating circumstances do not outweigh the mitigating factors of substance abuse and mental problems beyond a reasonable doubt. We will consider this argument during our independent sentence evaluation.

{¶ 84} ***Constitutional and international law challenges.*** In his seventh through 16th propositions of law, Ferguson raises various constitutional and treaty-related challenges against Ohio's death-penalty statutes. However, Ferguson failed to raise these claims at trial and thereby waived them. See *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus. Moreover, these challenges lack merit.

{¶ 85} In his seventh proposition of law, Ferguson contends that his execution will violate international law and treaties to which the United States is a party. However, we have rejected similar arguments. See *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

{¶ 86} In his eighth proposition of law, Ferguson argues that Ohio's death-penalty statutory scheme violates the United States and Ohio constitutional prohibitions against arbitrary and unequal punishment. However, these claims are without merit. *See State v. Jenkins* (1984), 15 Ohio St.3d 164, 169–170, 15 OBR 311, 473 N.E.2d 264; *State v. Steffen* (1987), 31 Ohio St.3d 111, 124–125, 31 OBR 273, 509 N.E.2d 383.

{¶ 87} In his ninth proposition of law, Ferguson claims that Ohio's death-penalty scheme is unconstitutional because of unreliable sentencing procedures. However, we have rejected these arguments on previous occasions. See *State v. Esparza* (1988), 39 Ohio St.3d 8, 12–13, 529 N.E.2d 192; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598; *State v. Jenkins*, 15 Ohio St.3d at 172–173, 15 OBR 311, 473 N.E.2d 264.

{¶ 88} In his tenth proposition of law, Ferguson asserts that Ohio's death-penalty statutes unconstitutionally fail to provide individualized sentencing because they require proof of aggravating circumstances during the guilt phase. This argument also has no merit. See *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568; *State v. Henderson* (1988), 39 Ohio St.3d 24, 28–

29, 528 N.E.2d 1237; *State v. Jenkins*, 15 Ohio St.3d at 178, 15 OBR 311, 473 N.E.2d 264.

{¶ 89} In his 11th proposition of law, Ferguson contends that Ohio's death-penalty scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. We also reject this argument. See *State v. Buell* (1986), 22 Ohio St.3d 124, 138, 22 OBR 203, 489 N.E.2d 795, citing *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph one of the syllabus.

{¶ 90} In his 12th proposition of law, Ferguson challenges Ohio's death-penalty statutes because R.C. 2929.03(D)(1) requires submission of defense-requested presentence investigations ("PSIs") and mental-health evaluations to the judge or jury. However, this argument is inapplicable to Ferguson's case because he declined a PSI and mental-health evaluation prior to sentencing. Moreover, we have previously rejected these arguments. See *State v. Buell*, 22 Ohio St.3d at 138, 22 OBR 203, 489 N.E.2d 795.

{¶ 91} In his 13th proposition of law, Ferguson disputes the constitutionality of R.C. 2929.04(A)(7), the felony-murder aggravating circumstance, because it repeats the definition of felony murder set forth in R.C. 2903.01(B). However, we rejected similar arguments in *State v. Jenkins*, 15 Ohio St.3d at 178, 15 OBR 311, 473 N.E.2d 264; see, also, *State v. Henderson*, 39 Ohio St.3d at 28–29, 528 N.E.2d 1237; *Coe v. Bell* (C.A.6, 1998), 161 F.3d 320, 349–350.

{¶ 92} In his 14th proposition of law, Ferguson asserts that language in R.C. 2929.03(D)(1) is unconstitutionally vague because it gives the sentencer unfettered discretion to weigh a statutory mitigating factor (see R.C. 2929.04(B): "the nature and circumstances of the offense") as an aggravator. We have also previously overruled this claim. See *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596, citing *Tuilaepa v. California* (1994), 512 U.S. 967, 973–980, 114 S.Ct. 2630, 129 L.Ed.2d 750.

{¶ 93} In his 15th proposition of law, Ferguson challenges the constitutionality of Ohio's death-penalty proportionality review. We summarily reject this claim. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 94} Finally, in his 16th proposition of law, Ferguson argues that his death sentences violate the Eighth Amendment of the United States Constitution because the trial court did not consider all of the evidence of mitigation in his case. However, Ferguson was found competent to waive mitigation, and thus *Ashworth*, 85 Ohio St.3d at 63, 706 N.E.2d 1231, applies. The court was not obliged to build a mitigation case for him. Nevertheless, the three-judge panel

searched the record for mitigating evidence and considered such mitigation before sentencing Ferguson to death. Thus, we reject this claim.

{¶ 95} *Pro se motion to waive oral argument.* On August 12, 2004, Ferguson filed in this court a pro se motion "to [w]aive any and all [o]ral [a]rguments in this and any other cases." In his pro se filing, Ferguson stated, "I make this statement to speed up the process in this case, that I do not wish to delay, postpone, or cease this case in any way."

{¶ 96} Ferguson is represented by counsel and has not requested to relinquish counsel and represent himself. He filed this motion after the case had already been briefed by his counsel and the state had filed an answer brief. Moreover, Ferguson's counsel filed no motions to waive oral argument.

{¶ 97} Ferguson has no constitutional right to self-representation in the appellate process on direct appeal. *Martinez v. California Court of Appeal, Fourth Appellate Dist.* (2000), 528 U.S. 152, 163, 120 S.Ct. 684, 145 L.Ed.2d 597. Furthermore, "[a] defendant has no right to a 'hybrid' form of representation wherein he is represented by counsel, but also acts simultaneously as his own counsel." *State v. Keenan* (1998), 81 Ohio St.3d 133, 138, 689 N.E.2d 929, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122.

{¶ 98} We find that Ferguson's pro se motion lacks merit. Moreover, we determined that oral argument would be helpful in resolving the issues in this case and heard oral argument. Thus, Ferguson's pro se request was denied.

### Independent sentence evaluation

{¶ 99} Having considered Ferguson's propositions of law as required by R.C. 2929.05(A), we now independently review Ferguson's death sentences for appropriateness and proportionality. The evidence established beyond a reasonable doubt that Ferguson was properly convicted of the aggravating circumstances, namely, murder while under detention or while at large after having broken detention, R.C. 2929.04(A)(4), a "course of conduct" in killing two or more people, R.C. 2929.04(A)(5), and murder while committing or attempting to commit aggravated burglary, R.C. 2929.04(A)(7). Before the penalty phase, the three-judge panel merged the two (A)(7) specifications and merged the (A)(3) (escaping detection) specification with the (A)(5) and (A)(7) specifications.

{¶ 100} We now weigh the aggravating circumstances against the mitigating factors contained in R.C. 2929.04(B). Ferguson presented no mitigating evidence during the penalty phase. However, he elected to make a statement in allocution prior to being sentenced. The three-judge panel also reviewed Dr. Bergman's competency evaluation and scoured the record for mitigating evidence before sentencing Ferguson to death.

{¶ 101} The record reveals that Ferguson was born in Phoenix, Arizona and moved with his family to Dayton when he was three or four years old. His parents never married, and his father never lived with the family. Ferguson reported that his father visited him a few times during his childhood years, but he did not see very much of him.

{¶ 102} Ferguson's mother had a number of boyfriends and married his stepfather when Ferguson was 17 or 18 years old. Ferguson said that his mother and most of her boyfriends used marijuana and alcohol. Ferguson's mother runs a business cleaning houses, and his stepfather works for the city of Dayton. Ferguson has a very close relationship with his mother, but does not get along with his stepfather. Ferguson also has an older sister and an older brother. He had another brother who committed suicide when Ferguson was 20 years old.

{¶ 103} Ferguson attended Dayton area schools. Ferguson said that he was receiving As and Bs, but was in the "developmentally handicapped (DH) class and was slow to learn." During the tenth grade, Ferguson was expelled from Dunbar High School. Ferguson said that his expulsion was related to "positive results on a drug test."

{¶ 104} Ferguson has been involved in two serious relationships with women. His first relationship started when he was 15 years old and lasted four years. Ferguson physically abused her, and the relationship ended when he "just left" because he could not stand to be around her any longer. Ferguson had a daughter during this relationship, but he has never had any contact with her.

{¶ 105} Ferguson's second relationship began when he was 19 years old and lasted for two years. Ferguson said that his girlfriend left the relationship because she was afraid of him. According to Ferguson, "[s]he saw the type of rage that I am capable of." On one occasion, Ferguson admitted that he "threw his girlfriend's ex-boyfriend through the window of a bus and then left the scene." Ferguson had a son during this relationship but has had no contact with the child since he was a baby. Ferguson "believes that his son would benefit from a relationship with him and also believes that if his son was with him, he would not have committed the instant offenses, because he would have been doing things for his son."

{¶ 106} Ferguson reported that after he left school, he worked as a stripper and was a street fighter. Ferguson described street fighting as an illegal, "underground" enterprise. According to him, he had "a trainer and a promoter and was paid between eighty and one hundred thousand dollars per fight, of which he actually pocketed forty thousand dollars." Ferguson said that he "engaged in ten to fifteen fights per year and was never seriously hurt." Ferguson also said that he "enjoyed jumping a freight train and riding some-

where." He would sometimes be gone from four to six months at a time and always had money in his pocket as a result of his street-fighting success.

{¶ 107} Ferguson said that he began using toluene at the age of 16, steroids at the age of 17, and crack cocaine at the age of 20. Ferguson stated that he got addicted to crack and was using one to three ounces every three to four days. He also sold crack cocaine to cover his expenses and stated that he was "robbing the 'dope boys'—beat them up and take it."

{¶ 108} Ferguson reported that he had no juvenile criminal history. However, Ferguson said that when he was 19, he was charged with numerous offenses, including several assaults, carrying a concealed weapon, several thefts, grand theft, and child endangering. He stated that he was placed on probation for these offenses. In 1999, Ferguson was convicted of burglary and sentenced to two years in prison.

{¶ 109} Testing showed that Ferguson has below-average intelligence. Ferguson's full-scale IQ was 77 on the Wechsler Adult Intelligence Scale–III. Personality testing "showed significant elevations on the Mania, Antisocial Features, and Aggression scales." According to Dr. Bergman, "[t]he antisocial features of the profile appear to be most prominent and markedly elevated. An individual with such personality characteristics is typically unreliable and irresponsible, with little sustained success in social or occupational realms." Dr. Bergman also found that "the aggression scale was also markedly elevated, indicative of an individual who is easily provoked and who shows explosive anger when frustrated." However, Dr. Bergman found "no active symptoms of a major mental disorder," and her primary diagnosis was that Ferguson had an antisocial personality disorder.

{¶ 110} Ferguson's medical records show that he received treatment over several years for ADHD. He has also received treatment for "several psychiatric disorders, including bipolar disorder." Dr. Mossman reported that Ferguson "has engaged in activities frequently associated with brain damage, and that past medical records suggest the possibility of neurological abnormalities." Moreover, Dr. Mossman states that "a clinical psychiatric examination and evaluation of Mr. Ferguson's medical records provide strong reasons to believe that he has high impulsivity and that he may have brain dysfunction."

{¶ 111} Before sentencing, counsel stated that Ferguson wanted to read a letter to the court even though his lawyers advised him not to do so. Ferguson made the following statement to the court:

{¶ 112} "Today I stand before the Court to be judged and sentenced for the crimes of murders of Thomas S. King, Sr., Arlie Fugate, and Mae Fugate. I do understand that the victim's family and the friends of the victim's family as well as others wants justice served * * * on a platter to them for what I did * * * in December of 2001.

{¶ 113} " * * *

{¶ 114} "I, Darrell W. AKA Gator Ferguson, does not care if you're here to get justice served to you or not. I, Darrell W. AKA Gator Ferguson, does not care what you don't like about what I did to your loved ones. And I, Darrell W. AKA Gator Ferguson, does not care what you think about me, because who I am and what I am and * * * [I] will always remain that way.

{¶ 115} "When I killed Thomas S. King, Sr., and Arlie Fugate and Mae Fugate, I did it intentionally, and the killings * * * were malicious and hideous acts just as I intended them to be. I took the satisfaction, Brenda King and James Cornett, of killing your loved ones with pleasure. And I enjoyed it.

{¶ 116} " * * *

{¶ 117} "I, Darrell W. Gator Ferguson, does not have no remorse for either side of the victim's family nor do I have no remorse for their slaughtered loved ones. I hate you and I hate you and I hate you.

{¶ 118} "I pray that Thomas S. King, Sr., Arlie Fugate, and Mae Fugate are in hell right now in agonizing pain and torment. They shall never rest, only burn for eternity.

{¶ 119} "Brenda King and James Cornett, if I had the power to bring your loved ones back, I, Darrell W. Gator Ferguson, would not bring them back. I will never show any remorse even on that day that I die.

{¶ 120} "The only thing I want for Thomas S. King, Sr., Arlie Fugate, Mae Fugate, is to suffer, burn, and have agonizing pain in hell.

{¶ 121} "I sit in my cell every day for the past 21 months and * * * asked myself over and over where was your Jesus * * * to save his poor, innocent lambs. Your God of false hope has vanished into nothingness. * * * And if you consider my god, lord Satan, a killer, then it is his blood that runs through my veins and fills my heart full of hideous acts and hatred.

{¶ 122} " * * * Let's just say that if I was to be freed to go back out in society, I'd pick up where I left off from and take the pleasure of causing destruction. I'm not afraid of death like some of you are. * * *

{¶ 123} " * * * I will pray night and day as I sit in prison in my own darkness that for every one of you who are here to see justice served that you and your precious loved ones are driving down the road and the * * * car blows up and kills every one of you. May death come over all of you.

{¶ 124} "To my God, and to my family and friends, love. And to my enemies, death. Hail, lord Satan. Done."

{¶ 125} Nothing in the nature and circumstances of the offenses appears mitigating. On December 25, 2001, Ferguson murdered King, an elderly and

disabled man, and burglarized his home. On December 26, 2001, Ferguson murdered Arlie and Mae Fugate, an elderly couple, and burglarized their home. Ferguson committed all three murders as part of a course of conduct while he was at large after not returning to Talbert House.

{¶ 126} We find that the statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), and (B)(6) (accomplice only).

{¶ 127} We give little weight to the R.C. 2929.04(B)(4) mitigating factor (youth of the offender) because Ferguson was 23 years old at the time of the offenses. See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 197; *State v. Hartman* (2001), 93 Ohio St.3d 274, 306, 754 N.E.2d 1150; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988.

{¶ 128} We find the R.C. 2929.04(B)(5) mitigating factor (lack of a significant history of prior criminal convictions) to be inapplicable because of Ferguson's prior conviction for burglary.

{¶ 129} The R.C. 2929.04(B)(3) mitigating factor is not applicable, because there was no evidence that Ferguson, by reason of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. However, under the catchall provision, R.C. 2929.04(B)(7), we give weight to Ferguson's history of mental health problems. Ferguson suffers from ADHD and has received treatment for a bipolar disorder. He also has a long history of drug and alcohol abuse. Moreover, Dr. Mossman's evaluation suggests the possibility that Ferguson may have a neurological abnormality. On the other hand, Dr. Bergman's comprehensive evaluation of Ferguson found "no active symptoms of a major mental disorder," and she diagnosed him with an antisocial-personality disorder.

{¶ 130} We also give some weight under R.C. 2929.04(B)(7) to Ferguson's cooperation with the police and his guilty pleas. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 125; *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376.

{¶ 131} However, Ferguson expressed no remorse for his crimes. Indeed, in his allocution statement, Ferguson stated in graphic terms that he took great satisfaction in killing his victims, felt no sorrow for his victims or their surviving family members, and if he was ever free, he would "pick up where [he] left off * * * and take the pleasure of causing destruction." Thus, by his own words, Ferguson is a remorseless, sadistic, and incorrigible killer.

{¶ 132} We find that Ferguson's history and background provide some mitigating value. Ferguson had a disruptive childhood and was raised in a dysfunctional family. Otherwise, his character offers no redeeming features.

{¶ 133} After weighing the aggravating circumstances against the mitigating factors, we find that the aggravating circumstances as to each aggravated murder outweigh the mitigating factors beyond a reasonable doubt. Ferguson's course of conduct in murdering Thomas King and Arlie and Mae Fugate during the course of an aggravated burglary and while he was at large after breaking detention constitute grave aggravating circumstances. Ferguson's mitigating evidence pales in comparison.

{¶ 134} We reject Ferguson's argument, in his fifth proposition of law, that the aggravating circumstances do not outweigh the mitigating factors because of the severity of his mental problems. Ferguson's primary diagnosis was an antisocial personality, and he displayed no active symptoms of a major mental disorder.

{¶ 135} We find that the death penalties imposed in this case are both appropriate and proportionate when compared with other "course of conduct" murders. See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 203; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 130. They are also appropriate and proportionate when compared to sentences in other burglary-murder cases. *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 145; *State v. Jones* (2000), 90 Ohio St.3d 403, 423, 739 N.E.2d 300; *State v. Campbell* (1994), 69 Ohio St.3d 38, 56, 630 N.E.2d 339. Finally, the death sentences are appropriate and proportionate to sentences in other murders committed while the defendant was under detention or at large after breaking detention. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 130; *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 172.

{¶ 136} Accordingly, we affirm Ferguson's convictions and sentences of death. We also dismiss Ferguson's pro se motion to waive oral argument.

Judgment affirmed.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram and Natalia S. Harris, Assistant Prosecuting Attorneys, for appellee.

Altick & Corwin, L.P.A., and Gary W. Crim; and Dennis J. Adkins, for appellant.